**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
BLUEFIELD DIVISION**

**DARNELL RAY PALMER,**

> **Plaintiff,**

**v.**                                                          **Civil Action No. 1:19-cv-00112**

**ANDREW SAUL,**[1]
**COMMISSIONER OF SOCIAL SECURITY,**

> **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATION

Plaintiff Darnell Ray Palmer ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33. By standing order entered on January 4, 2016, and filed in this case on February 15, 2019, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 3.) Presently pending before this Court are Plaintiff's Motion for Summary Judgment and supporting memorandum (ECF Nos. 11, 12) and the Commissioner's Brief in Support of Defendant's Decision (ECF No. 15).

---

[1] Andrew Saul is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Federal Rule of Civil Procedure 25(d). *See also* 42 U.S.C. § 405(g) (stating that action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Claimant's motion for summary judgment (ECF No. 11), **GRANT** the Commissioner's request to affirm his decision (ECF No. 15), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

## I.   BACKGROUND

### A. Information about Claimant and Procedural History of Claim

Claimant was 40 years old at the time of his alleged disability onset date and 57 years old on the date of the controlling decision by the Administrative Law Judge ("ALJ"). (*See* Tr. at 338.)[2]  He holds a bachelor's degree.  (*Id.* at 125.)  Most recently, he worked as a substitute teacher and owned a self-storage business, and he has also worked as a senior buyer for an electronics manufacturer and as an auto mechanic.  (*Id.* at 323, 333, 348.) Claimant alleges that he became disabled on November 1, 1999, due to lower back problems and leg problems.  (*Id.* at 286, 342.)

Claimant protectively filed his application for benefits on August 29, 2012.  (*Id.* at 286–87, 307.)  His claim was initially denied on February 20, 2013, and again upon reconsideration on April 2, 2013.  (*Id.* at 137–56.)  Thereafter, on May 14, 2013, Claimant filed a written request for hearing.  (*Id.* at 184–85.)  An administrative hearing was held before an ALJ on July 30, 2014, in Charleston, West Virginia.  (*Id.* at 91–108.)  On October 9, 2014, the ALJ entered an unfavorable decision.  (*Id.* at 157–69.)  Claimant then sought review of the ALJ's decision by the Appeals Council, and the Appeals Council granted Claimant's request for review on May 9, 2016, vacated the ALJ's decision, and remanded the case for further proceedings.  (*Id.* at 170–74.)

---

[2] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF No. 8.

Upon remand, a different ALJ held a second hearing on December 20, 2016, in Charleston, West Virginia.  (*Id.* at 109–36.)  On April 27, 2017, that ALJ entered an unfavorable decision.  (*Id.* at 6–21.)  Claimant sought review of this decision by the Appeals Council (*id.* at 285), but the Appeals Council denied Claimant's request for review on March 8, 2018 (*id.* at 1–7).  The ALJ's decision became the final decision of the Commissioner on that date.

Claimant timely brought the present action on February 13, 2019, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).  (ECF No. 2.)  The Commissioner filed an Answer (ECF No. 7) and a transcript of the administrative proceedings (ECF No. 8).  Claimant subsequently filed his Motion for Summary Judgment and supporting memorandum (ECF Nos. 11, 12), and in response, the Commissioner filed his Brief in Support of Defendant's Decision (ECF No. 15).  As such, this matter is fully briefed and ready for resolution.

### B. Relevant Evidence

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and summarizes it here for the convenience of the United States District Judge.

#### 1. Claimant's Testimony at July 30, 2014 Hearing

At the hearing held before the first ALJ on July 30, 2014, the ALJ began by noting that Claimant appeared without a representative and advised him of his right to representation.  (Tr. at 93–94.)  Claimant indicated that he understood his right to representation.  (*Id.* at 94.) The ALJ gave Claimant the option to postpone the hearing so that he could obtain representation, but Claimant elected to proceed with the hearing.  (*Id.*)

The ALJ asked Claimant if he worked from 2005 until 2012.  (*Id*. at 96.)  Claimant stated that he did not work during that time, explaining that he had a business, but his "family runs it." (*Id*.)  He represented that his family purchased the business in 2006. (*Id*. at 98.)  Claimant continued, "Based on my credit and so forth, it had to be in my name but, you know, that's where you're probably getting that I worked from." (*Id*. at 96.)  He also explained that he made between $400 and $500 total working as a substitute teacher beginning in 2007.  (*Id*. at 97, 100.)  The ALJ then asked, "Other than the substitute teaching . . . when is the last time you had a job that was full time for at least three months?" (*Id*. at 98.) Claimant replied, "Back in 1988 through 1990." (*Id*.; *see id*. at 99.) The ALJ asked Claimant about the reported income on his tax returns for 1999, 2001, and 2002.  (*Id*. at 99.)  Claimant explained that his children worked in a family business that Claimant used his credit to obtain, but "it's not me doing the work." (*Id*.)

Upon hearing this testimony, the ALJ said, "Well, we got a little problem because the type of benefits you're claiming are based on when someone works, and they pay into the system, they get credit. . . . You're saying you never worked and you never actually earned any money." (*Id*. at 99–100.)  Claimant again stated that he owned the business because he had the credit to establish it.  (*Id*. at 100.)  He represented that he did not pay his children a salary because he "had to survive." (*Id*.)  Again, the ALJ explained, "What you're claiming disability for is for people that have worked and when they work, they pay into the system and they earn credit towards Social Security retirement and disability. What you're telling me is you never really paid into the system.  The money actually went to your children, so how is it that you should qualify for disability if you haven't worked in the last 25 years?" (*Id*. at 101.)  Claimant answered that he paid Social Security taxes on his tax returns.  (*Id*. at 102–03.)  The ALJ requested copies of the returns.  (*Id*. at 103,

105–06.) The ALJ asked Claimant if he still owned the business, and Claimant responded that he did. (*Id.* at 102.) The ALJ also pointed out that in 1999, 2001, and 2002, Claimant's children "would have been under ten years old," but Claimant asserted that they were working. (*Id.*) Claimant explained that his nephews were primarily doing the work during this time, but he "was raised up to teach your children to work from a young age." (*Id.*)

The ALJ then asked Claimant, "whatever you've done since 1996 as a business owner, you're continuing to do?" (*Id.* at 104.) Claimant answered that he was "not in the shape to continue" and "not physically able anymore to do anything." (*Id.*) He explained that "it's just setting things in place, having the family to help." (*Id.*) Claimant also stated that he went to the self-storage business "[m]aybe an hour a week, if that" and would answer the phone "[i]f [it] rings." (*Id.* at 106.)

### 2. *Claimant's Testimony at December 20, 2016 Hearing*

The second ALJ, who presided over the hearing held on December 20, 2016, also opened the hearing by explaining to Claimant that he had a right to representation and warned him that he "might be boxing [himself] in with the decision [he] ma[d]e now." (*Id.* at 111–13.) Claimant stated that he understood his right to representation. (*Id.* at 113.) The ALJ offered Claimant "time . . . to hire someone to represent [him]," but Claimant elected to proceed with the hearing. (*Id.*)

The ALJ asked Claimant if he had worked since November 1, 1999. (*Id.* at 125.) Claimant responded that he had not worked "a meaningful job" since then." (*Id.*) He explained that he "helped with [his family's] storage [business] at points in times [sic]. . . . [He] had answered the phone some but as far as doing any type of work, no." (*Id.* at 126.) The ALJ then asked Claimant if the income reported on his earnings record "[w]as

5

. . . paid to [Claimant] for what [he] did on behalf of the storage garage business." (*Id.*)
Claimant stated that the reported amount was "what was made after everything for that
business." (*Id.*)  The ALJ asked Claimant if he contributed significantly to the business,
and Claimant replied, "I guess if answering the phone is significant, yeah." (*Id.*)  Then,
the ALJ asked Claimant "who did the actual work that was needed to run the business."
(*Id.* at 127.)  Claimant represented that his son "did any of the physical part of it." (*Id.* at
127–28.)  He explained that "because [his] credit was good . . . everything was put to
[Claimant] . . . in [his] name." (*Id.* at 127.)  The ALJ asked Claimant if "the earnings
legitimately belong[ed] to [Claimant's] sons because they actually did the work," and
Claimant replied, "a part of it maybe, not all of it." (*Id.* at 128–29.)  When the ALJ asked
Claimant to estimate "what percentage of [his] earnings was [his] and what . . . really
should have gone to [his] sons," Claimant stated that "75% should have gone to [him],
25% to them." (*Id.* at 129.)  Claimant also stated that beginning in 2011 or 2012, his son
"stepped up and he took care of . . . 60% of the things." (*Id.*)

The ALJ next explained that Claimant's earnings record showed that he "made too
much money . . . to be disabled." (*Id.* at 130.)  He then stated that Claimant "ha[d] about
five years of insurance when [he] stopped working to establish [his] disability." (*Id.*)  The
ALJ continued, "At one point, you said the kids did the work, and claiming the earnings
for yourself does help your insured status, but it also puts you in where you're making too
much money. . . . It looks to me like your legitimate earnings expired prior to you
becoming disabled, where you couldn't contribute significantly to the business.  That is
the legitimate earnings of the business should have been apportioned more to your son
than what you did." (*Id.*)  Claimant stated, "I guess the thing of the portions is where it
seems the problem is, the amount that was actually given to him and I guess how I

reported it, I think is where the problem is." (*Id.* at 131.)  The ALJ indicated that Claimant's understanding was correct and further explained, "Title II benefits is [sic] based on your earnings record, and that is very complicated because . . . there's earnings in there that really aren't yours, therefore, you shouldn't get credit for . . . the insured status that they generate." (*Id.*)  He then went on to state that Claimant's earnings record suggests that he was "still working full time" after his alleged onset date. (*Id.* at 132.)

Next, the ALJ attempted to determine if Claimant's activities for the self-storage business were "significant to the operation of the business." (*Id.* at 132.)  He mentioned that there were "three tests" and asked Claimant if his "actions in making that business successful contributed substantially to the success of the business" and if his family could have run the business without him. (*Id.* at 132–33.)  Claimant answered that they could have, but it would have been "a great challenge for [his wife]" due to her fibromyalgia. (*Id.* at 133.)

### 3.  Claimant's Submissions to Social Security Administration

On October 29, 2012, Claimant submitted a Work Activity Report – Self-Employment in which he represented that he had not worked since November 1, 1999, but income was reported for him because his son worked. (*Id.* at 318–25.)  He elaborated, "I 'own' DJS Self Storage in 'name only' because of credit reasons.  It's a family business.  I do not do any work in the business.  My son . . . does the work in the storage business.  I go over to the storage buildings every now and then, about 2 times a month.  In the past, I would sometimes make calls for the business." (*Id.* at 323.)

Claimant wrote a letter to the Appeals Council dated November 11, 2014, and represented that he "ha[d] not worked in any true capacity . . . as it relates to working for a company of any sort" since 1990, "except for temp substitute teaching." (*Id.* at 397.)  He

explained that he "did various small odd jobs" since 1999, and his "children, nephews, and a few cousins would help out and earn them some extra money." (*Id.*) Claimant further stated that he established his self-storage business in 2006. (*Id.*) He asserted that even though he "engaged in what is considered gainful employment from a financial standpoint" in 2006, 2009, 2010, and 2011, "there were years from 2000 to 2011 where [his] efforts were only substantial but not gainful and there were years where [his] efforts were gainful but not substantial." (*Id.* at 398.)

In the course of pursuing his application for benefits, Claimant submitted a Work History Report, which stated that from 1988 until 1990, he worked as a senior buyer for an electronics manufacturing company and made $9.27 per hour, and from 1996 until 1998, he worked as an auto mechanic and made $700 per month. (*Id.* at 348–55.)

On May 22, 2016, Claimant wrote a letter to the ALJ in which he explained that from 2000 until 2006, he "was self employed doing odd jobs," which he described as "lawn services and small carpentry jobs." (*Id.* at 425.) Claimant then stated that between 2006 and 2011, he "[h]elped to operate a small storage facility established for [his] family [and] children." (*Id.*) He represented that after 2011, "[i]t became increasingly more difficult to ambulate with a cane" and he "had to use a wheel chair [sic] at times to get around." (*Id.*)

*C. Sequential Evaluation Process*

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential

8

evaluation process to aid in this determination.    20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017).  The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity."  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments.  *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001).  An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled."    20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iii),  416.920(a)(4)(iii).    "A claimant is entitled to a conclusive

presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "her ability to perform work despite her limitations." *Patterson v. Comm'r*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659. Considering the claimant's

"pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria. 20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id.* §§ 404.1520a(c), 416.920a(c). "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of his past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If he does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether he can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find him "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If he cannot perform other work, the ALJ will find him "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ in the controlling decision concluded that Claimant was insured through December 30, 1999.  (Tr. at 11.)[3] He further determined that Claimant did not engage in substantial gainful activity between November 1, 1999, and December 31, 1999.  (*Id.* at 13.)[4]  He found that Claimant's medically determinable impairments at that time included "bony abnormalities in the left ankle and degenerative joint disease of the tibiofemoral and patellofemoral joints," but he found that neither was severe because the impairments did not "significantly limit[] the ability to perform work activities for 12 consecutive months." (*Id.* at 14.)  As a result, the ALJ concluded that Claimant was not "under a disability . . . at any time from November 1, 1999, the alleged onset date, through December 30, 1999, the date last insured."  (*Id.* at 16.)

## II.    *LEGAL STANDARD*

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)).  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla."  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it

---

[3] As Claimant notes, the introduction to the ALJ's written decision states, "The claimant's earnings record should [as explained hereafter] show that the claimant has acquired sufficient quarters of coverage to remain insured through December 3, 2003."  (Tr. at 10; *see* ECF No. 12 at 11.)  However, this appears to be a clerical error, as the ALJ determined in his Findings of Fact and Conclusions of Law that Claimant was insured through December 30, 1999.  (Tr. at 11–13.)  As such, the undersigned disregards the December 3, 2003 date.

[4] The one-day discrepancy in the date with respect to this finding appears to be a clerical error, which the undersigned disregards because it does not materially affect the ALJ's conclusions.

contains 'sufficient evidence' to support the agency's factual determinations." *Id.* (alteration omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id.* (quoting *Craig*, 76 F.3d at 589).

### III.    ANALYSIS

Claimant argues that the ALJ improperly determined that Claimant was insured only through December 30, 1999, and did not adequately explain that finding. (ECF No. 12 at 6–11.) He further argues that on remand from the Appeals Council, the ALJ failed to follow the Appeals Council's directives and did not help Claimant, who proceeded pro se, develop the administrative record. (*Id.* at 12–15.) Claimant asks this Court to reverse the Commissioner's decision and award him benefits or to reverse the Commissioner's decision and remand this matter to the ALJ. (*Id.* at 15.) The Commissioner responds that the ALJ's date-last-insured finding is supported by substantial evidence, that the ALJ complied with the Appeals Council's order, and that the ALJ adequately informed Claimant of his right to representation and explained the issues to Claimant. (ECF No. 15 at 8–13.)

#### A. Date Last Insured

Claimant first argues that the ALJ arbitrarily determined that Claimant's self-employment income after 1999 did not count toward Claimant's disability insured status. (ECF No. 12 at 7, 10.) He further asserts that the ALJ did not explain his conclusion that

Claimant was insured through December 30, 1999. (*Id.* at 11.) In order to qualify for DIB, a claimant must "have disability insured status" and "be fully insured" through the date he is determined to be disabled. 20 C.F.R. §§ 404.130(a), 404.131(a). As relevant in this case, "[a]n individual shall be insured for [DIB] in any month if . . . he had not less than 20 quarters of coverage during the 40-quarter period which ends with the quarter in which such month occurred." 42 U.S.C. § 423(c)(1)(B)(i). When the ALJ performed this calculation and found that Claimant was insured through December 30, 1999, he included Claimant's earnings from substitute teaching beginning in 2007 but excluded Claimant's reported self-employment income "from 2000 forward." (Tr. at 12–13.)

Claimant argues that the ALJ erred by attributing Claimant's earnings after 1999 to Claimant's children and nephews when they would have been under the age of five or young teenagers at that time. (ECF No. 12 at 7–8.) Claimant also contends that the ALJ failed to account for "other, less physical, or non-physical tasks necessary to the operation of the business." (*Id.* at 10.) But the ALJ based his conclusions on Claimant's own representations. (*See* Tr. at 12.) For instance, the ALJ noted that at Claimant's initial hearing held on July 30, 2014,[5] Claimant testified that he had not engaged in "gainful employment" since 1990. (*Id.*; *see id.* at 98–99.) Claimant again stated in a November 11, 2014 letter to the Appeals Council that he "ha[d] not worked in any true capacity . . . as it relates to working for a company of any sort" since 1990. (*Id.* at 397.) However, he also reported on a Work History Report submitted to the Social Security Administration that between 1996 and 1998, he worked as an auto mechanic and made $700 per month.

---

[5] In his written decision, the ALJ inadvertently stated that the hearing was held on January 30, 2014. (Tr. at 12.)

(*Id.* at 348, 350.) As Claimant acknowledges, the ALJ considered Claimant's earnings for that period when calculating Claimant's disability insured status. (*See* ECF No. 12 at 7.)

Contrary to Claimant's assertion, the ALJ explained why he did not consider Claimant's reported self-employment earnings after 1999: that "income . . . should be attributed to other people." (Tr. at 12.) The ALJ noted that Claimant "reported he did various odd jobs . . . with the help of his children, nephews, and a few cousins." (*Id.*) Indeed, in a May 22, 2016 letter, Claimant stated that between 2000 and 2006, he "was self employed doing odd jobs," which he described as "lawn services and small carpentry jobs." (*Id.* at 425.) He testified at the July 30, 2014 hearing that his reported self-employment income in 1999, 2001, and 2002 was derived from his family's business, and although he claimed the income on his taxes, "it's not me doing the work." (*Id.* at 99.) Claimant explained that his children and his nephews did the work, even though—as Claimant points out—they would have been very young at the time. (*Id.* at 99, 102; *see* ECF No. 12 at 7–8.)

Claimant further stated in the May 22, 2016 letter that beginning in 2006, he "[h]elped to operate a small storage facility established for [his] family." (Tr. at 425; *see id.* at 98.) The ALJ noted that Claimant testified that "he helped with the storage business at times, such as answering the phone . . . but said he did not do any real work for the business." (*Id.* at 12; *see id.* at 106, 126.) The ALJ also noted that Claimant testified that his children and nephews "did the physical work." (*Id.* at 12; *see id.* at 127–28.) Indeed, Claimant testified that he did not work for the self-storage business but that his "family runs it." (*Id.* at 96.) He stated that he was there "[m]aybe an hour a week, if that." (*Id.* at 106.) This is consistent with Claimant's representation in an October 29, 2012 Work History Report he submitted to the Social Security Administration, in which Claimant

stated, "I 'own' DJS Self Storage in 'name only' because of credit reasons. . . . I do not do any work in the business. My son . . . does the work in the storage business. I go over to the storage buildings every now and then, about 2 times a month. In the past, I would sometimes make calls for the business." (*Id.* at 323.) Despite this, Claimant testified at his second hearing that "75% [of the income from the self-storage business] should have gone to [Claimant], 25% to [Claimant's children]." (*Id.* at 129.)

The ALJ's exclusion of this income from Claimant's earnings was not error. An individual is entitled to a "quarter of coverage" for the purpose of calculating his date last insured for "each portion of the total of the wages paid and the self-employment income credited . . . to an individual in a calendar year which equals the amount required for a quarter of coverage in that calendar year." 42 U.S.C. § 413(a)(2)(A)(ii). "The term 'self-employment income' means the net earnings from self-employment *derived by an individual* . . . during any taxable year . . . ." *Id.* § 411(b) (emphasis supplied). Likewise, "[t]he term 'net earnings from self-employment' means the gross income . . . *derived by an individual* from any trade or business *carried on by such individual*." *Id.* § 411(a) (emphasis supplied). In other words, "the labor of the individual [is] the important factor in determining self-employment income." *Raines v. Harris*, 508 F. Supp. 17, 19 (W.D. Va. 1980) (citing *Delno v. Celebrezze*, 347 F.2d 159, 162–63 (9th Cir. 1965); *Conklin v. Celebrezze*, 319 F.2d 569, 570–71 (7th Cir. 1963)); *see* SSR 70-55c, 1970 WL 5607 (Jan. 1, 1970) ("It is the actual receipt of self-employment income, not the reporting or payment of taxes thereon, which is the crucial test for establishing a valid claim."). This comports with the way the Social Security Administration evaluates substantial gainful activity from self-employment: the three tests focus on a claimant's "services that are significant to the operation of the business," his "hours, skills, energy output, efficiency, duties, and

responsibilities," and the "value [of the claimant's work] to the business."  20 C.F.R. § 404.1575(a)(2).  When a claimant's self-employment business "involves the services of more than one person," he "render[s] significant services if [he] contribute[s] more than half the total time required for the management of the business, or [he] render[s] management services for more than 45 hours a month."  *Id.* § 404.1575(b)(1).

Contrary to Claimant's assertion, the ALJ's decision to exclude Claimant's reported self-employment income after 1999—with the exception of his earnings from substitute teaching—was not arbitrary.  (*See* Tr. at 12; ECF No. 12 at 7.)  Rather, it was based on Claimant's own statements that although he reported the income on his taxes, he did not actually do the work to earn that income.  (*See* Tr. at 323, 425.)  Accordingly, the undersigned **FINDS** that the ALJ properly calculated Claimant's date last insured.

### B. *Compliance with Appeals Council's Order*

Claimant next argues that the ALJ did not comply with the Appeals Council's directive to "determine if other parties should be joined to the action and if other individual should the allotted credit [sic] which was denied [Claimant]."  (ECF No. 12 at 12.)  When the Appeals Council remands a case to the ALJ, the ALJ "shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order."  20 C.F.R. § 404.977(b).  The ALJ in this case complied with the Appeals Council's order.

The Appeals Council first instructed the ALJ to "take the steps necessary to complete the administrate record."  (Tr. at 172.)  The ALJ held a second hearing during which he heard testimony from two medical experts and discussed Claimant's reported earnings in detail.  (*Id.* at 109–36.)  Next, the Appeals Council instructed the ALJ to "make findings and decide whether [Claimant] meets the insured status requirements for

[DIB]." (*Id.* at 173.) The ALJ did so, finding that Claimant was insured through December 30, 1999. (*Id.* at 11–13.) The Appeals Council then gave the ALJ the option "to consider whether [Claimant's] work is bona fide" and supplied instructions to the ALJ if he chose to do so. (*Id.* at 173.) The ALJ did not address this issue. (*See id.* at 9–16.)

Next, the Appeals Council instructed the ALJ to "make findings and decide whether [Claimant's] work activity constitutes substantial gainful activity" and "determine whether any other individual should be made a party to the hearing, such as [Claimant's] children and nephews that [Claimant] alleges did the work for the business." (*Id.* at 173.) The ALJ concluded that Claimant did not engage in substantial gainful activity during the relevant period for two reasons. (*See id.* at 13.) First, he determined that Claimant's "self-employment income during this period should not be attributed to [him]." (*Id.*) Second, he considered "whether [Claimant's] work qualified as substantial gainful activity in other ways" by applying the three tests found at 20 C.F.R. § 404.1575(a)(2). (*Id.* at 13–14.) He ultimately found that it did not. (*Id.*) And the ALJ clearly concluded that he need not hear testimony from Claimant's children or nephews in order to determine whether Claimant engaged in substantial gainful activity; Claimant consistently represented at both hearings and in other paperwork submitted to the Social Security Administration that his children or nephews performed the work he reported as self-employment income on his tax returns. (*See id.* at 96, 99, 102, 106, 126–28, 323, 425.) The Appeals Council's order did not require the ALJ to hear testimony from Claimant's children and nephews; rather, it instructed the ALJ to determine whether their testimony was necessary. (*Id.* at 173.)

Relatedly, the Appeals Council instructed the ALJ, if he found that Claimant "did not perform substantial gainful activity during the period at issue . . . to consider whether

18

the [Social Security] Administration can correct [Claimant's] earnings record and determine whether the earnings should be posted to another individual's record."  (*Id.*) The ALJ made this finding: he concluded that "income posted to [Claimant's] earnings record after 1999 should be attributed to other people; namely, [Claimant's] children and nephew."  (*Id.* at 12.)

Finally, the Appeals Council directed the ALJ to "consider whether [Claimant] is disabled in accordance with the sequential evaluation process."  (*Id.* at 173.)  The ALJ did so, concluding at step two that between Claimant's alleged onset date and his date last insured, he did not have a severe impairment or combination of impairments.  (*Id.* at 14–16.)  The ALJ thus determined that Claimant was not disabled.  (*Id.* at 16.)

Accordingly, the undersigned **FINDS** that the ALJ complied with the Appeals' Council's remand order.  Importantly, the Appeals Council denied Claimant's request for review of the second ALJ's written decision (*id.* at 1–5), which suggests that it also found no deficiency in the ALJ's compliance with its previous order.  *See* 20 C.F.R. § 404.970(a)(2) (providing that "Appeals Council will review a case if . . . [t]here is an error of law").

## C.  Duty to Develop Record

Lastly, Claimant argues that the ALJ failed in his duty to assist Claimant in developing the record by not explaining "the issues which would drive the decision in his case" and by not seeking additional information about Claimant's "qualifying quarters and potential substantial gainful activity."  (ECF No. 12 at 12–15.)  "[I]n *pro se* cases, ALJs have 'a duty to assume a more active role in helping claimants develop the record.'"  *Craig v. Chater*, 76 F.3d 585, 591 (4th Cir. 1996) (quoting *Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1980)).  Stated differently, "when a claimant is not represented, the ALJ is under a

heightened duty to ensure that all the facts of the case are fully explored, and . . . a failure on the part of the ALJ to perform this duty may result in prejudice to the claimant, thus requiring the case to be remanded for further proceedings." *Packer* ex rel. *G.G.P. v. Saul*, No. 3:19-cv-00257, 2019 WL 4458581, at *7 (S.D.W. Va. Aug. 29, 2019) (citing *Walker v. Harris*, 642 F.2d 712, 714 (4th Cir. 1981)), *adopted by* 2019 WL 4458864 (S.D.W. Va. Sept. 17, 2019).

As the undersigned previously explained, the ALJ had no obligation to hear testimony from Claimant's children and nephews about their work for Claimant's family businesses. Again, Claimant consistently represented throughout the proceedings before the Social Security Administration that his children or nephews performed the work he reported as self-employment income on his tax returns. (*See id.* at 96, 99, 102, 106, 126–28, 323, 425.) The ALJ even informed Claimant about the three self-employment tests found in 20 C.F.R. § 404.1575(a)(2) and attempted to review them with Claimant, but Claimant responded that his family could have run the businesses without him. (*Id.* at 132–133.) And Claimant fails to explain how testimony from his children or nephews about the work they did for the family businesses was necessary to the ALJ's decision, given that Claimant twice testified at length about it.

Claimant's argument that the ALJ did not explain the problem with Claimant's reported self-employment income is likewise without merit. At the hearing, after asking Claimant questions about the work he was doing since his alleged onset date, the ALJ asked Claimant if the income he reported was "paid to [him] for what [he] did on behalf of the storage garage business." (Tr. at 125–26.) Claimant responded that the reported income was "what was made after everything for that business." (*Id.* at 126.) When the ALJ asked Claimant if "the earnings legitimately belong[ed] to [his] sons because they

20

actually did the work," Claimant responded that "75% should have gone to [Claimant], 25% to [his sons]." (*Id.* at 128–29.) This prompted the ALJ to explain to Claimant that using the earnings Claimant reported, Claimant was insured for a longer period but "made too much money . . . to be disabled." (*Id.* at 130.) The ALJ stated, "It looks to me like your legitimate earnings expired prior to you becoming disabled, where you couldn't contribute significantly to the business. That is the legitimate earnings of the business should be been apportioned more to your son than what you did." (*Id.*) Claimant clarified that he understood "the thing of the portions is where it seems the problem is, the amount that was actually given to [Claimant's son] and . . . how [Claimant] reported it." (*Id.* at 131.) The ALJ confirmed that Claimant's understanding was correct and further explained, "there's earnings in [Claimant's earnings record] that really aren't [Claimant's], therefore, [he] shouldn't get credit for the . . . insured status that they generate." (*Id.*)

Similarly, the ALJ at Claimant's first hearing had explained, "we got a little problem because the type of benefits you're claiming are based on when someone works, and they pay into the system, they get credit." (*Id.* at 99.) He also stated, "What you're claiming disability for is for people that have worked and when they work, they pay into the system and they earn credit towards Social Security retirement and disability. What you're telling me is that you never really worked and you never really paid into the system." (*Id.* at 101.) Even if Claimant did not understand this obstacle to the success of his DIB claim prior to the ALJ explaining it to him at the first hearing, he clearly understood it by the second hearing. (*See id.* at 131.) Claimant has a college education. (*Id.* at 125.) He was informed at both hearings of his right to representation but elected to proceed pro se. (*Id.* at 93–94, 111–13.) The ALJ's duty to develop the record does not

require him "to act as Claimant's counsel." *Perry v. Astrue*, No. 3:10-cv-01248, 2011 WL 5006505, at *15 (S.D.W. Va. Oct. 20, 2011) (citing *Clark v. Shalala*, 28 F.3d 828, 830–31 (8th Cir. 1994)). The ALJ must simply "collect enough evidence to allow for the issuance of a fair and reasoned decision on the claimant's application for benefits." *Hammond v. Astrue*, No. 3:11-cv-00871, 2012 WL 4118277, at *8 (S.D.W. Va. Sept. 19, 2012) (citing *Bell v. Chater*, 57 F.3d 1065 (table) (4th Cir. 1995) (per curiam), 1995 WL 347142, at *4). The undersigned **FINDS** that the ALJ satisfied that obligation in this case.

## IV.    CONCLUSION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Claimant's motion for summary judgment (ECF No. 11), **GRANT** the Commissioner's request to affirm his decision (ECF No. 15), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable David A. Faber, Senior United States District Judge. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown. Copies of any objections shall be served on opposing parties and provided to Judge Faber.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit

Court of Appeals.  28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985);

*Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841,

846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and

to transmit a copy of the same to counsel of record.

ENTER: November 19, 2019

Dwane L. Tinsley
United States Magistrate Judge

23